Filed 4/11/16 P. v. Fitts CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CLEOPHUS FITTS, JR.,<br><br>    Defendant and Appellant. | G052189<br><br>(Super. Ct. No. RIF1201986)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, Michael B. Donner, Judge.  Affirmed.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

Cleophus Fitts, Jr., appeals from the judgment convicting him of aggravated assault against a child (Penal Code, § 273ab, subd. (b); all further undesignated references are to this code.) He argues the judgment must be reversed because (1) the trial court erred in admitting evidence of prior incidents involving his treatment of the young son of his then live-in girlfriend, (2) the court improperly limited the scope of defense counsel's closing argument, and (3) the court improperly imposed an administrative fee pursuant to section 1203.1. The Attorney General concedes the last point, but we reject it. The cases cited by both defendant and the Attorney General as support for the point do not provide it. We likewise find no merit in defendant's other assertions and consequently affirm the judgment.

FACTS

In February 2012, defendant brought his unconscious two-and-half-year-old son, J.M., to the emergency room. Defendant was distraught, and explained that after he had put J.M. to bed, he heard him cry and found him at the bottom of the stairs. Defendant also stated J.M. might have gone to bed with a grape in his mouth and choked on it. Defendant told emergency room personnel that on his way to the emergency room, he repeatedly shook J.M. in an effort to keep him awake.

After J.M. arrived at the hospital, he began seizing and gasping for air, and had to be intubated. It was determined he had suffered a brain hemorrhage, and he was airlifted to another hospital where he underwent brain surgery. J.M. remained comatose for two weeks following surgery and suffered a permanent brain injury.

Due to the severity of J.M.'s injuries and defendant's inconsistent explanations of what happened, staff at the first hospital filed a report of suspected child abuse. Deputy Quesada of the Riverside County Sheriff's Department arrived at the hospital at about 11:30 p.m. About an hour and a half later, Sherriff's Investigator Glenn

2

Johnson arrived at the hospital. When J.M. was airlifted to the second hospital, defendant went with Johnson to the police station, where Johnson interviewed him. Defendant was cooperative, and disclosed that he had a prior conviction for misdemeanor assault on a child. Defendant then gave permission for officers to search his home, where they found evidence J.M. was undergoing potty training.

Johnson explained that he went over the circumstances of J.M.'s injury several times with defendant during their interview, which is a standard investigative technique, and defendant offered conflicting versions of what happened. For example, defendant initially told Johnson he was downstairs when J.M. was injured, but at a later point said they were both upstairs. He was inconsistent about whether J.M. was crying when he found him at the bottom of the stairs. At other points, defendant said different things about the need to remove J.M.'s diaper. Initially, he claimed it was because J.M. wanted to urinate, but later he stated the diaper had been soiled with diarrhea.

In April 2012, defendant was charged with aggravated assault against a child. At trial, the court allowed the prosecutor to introduce evidence of two prior incidents reflecting defendant's mistreatment of a small child, over defendant's objection. Both incidents occurred in early 2010 and involved three-year-old C.C., the son of defendant's then-girlfriend, while they were living in the State of Washington. In the first incident, C.C. soiled himself while at preschool, and when the teacher took him to the bathroom to get cleaned up, he told her "[D]addy [referring to defendant] going to whoop my ass." When the teacher asked him why, he said "because I poopy." The teacher did not discover any injuries on his buttocks. However, when she mentioned the comment to defendant later that day, he appeared unconcerned and merely stated "that's because he knows he's in trouble."

The second incident occurred two months later. Shortly after defendant had dropped off C.C. at preschool, his teacher noticed bruises on C.C.'s neck and discoloration around his eyes and ears – what the paramedics later called petechia. She

3

asked C.C. what had happened to his neck, noting it looked like he had an "owie." He responded, "[D]addy choked me" and put his hands on his neck. When she asked him where it happened, he said it was in the car. He had tears in his eyes, which he mostly kept downcast, and appeared to be on the verge of crying. When the teacher asked C.C. to tell the other teacher what had happened, he said "[D]addy whoop my ass with a shoe" but did not mention his neck. As a result of that second incident, defendant pleaded guilty to a charge of misdemeanor assault, although he denied any belief that he was guilty.

A forensic pediatrician also testified about J.M.'s injuries. He examined J.M. two days after he was admitted to the hospital, and noted bruises and scars all over his body. The scars included several that were consistent with having been struck with a belt, and the pediatrician stated that overall J.M.'s injuries "seem to be too many and in too many atypical locations" to be the result of common toddler mishaps. The pediatrician also testified about the different injuries a child would likely suffer as a result of falling down stairs, as opposed to being abused. He opined that the severity and extent of J.M.'s injuries were not consistent with falling down stairs. J.M.'s head injuries were, however, consistent with cases of severe shaking, and he had an injury to his pancreas that was consistent with blunt force trauma, such as being kicked or punched. J.M. also had current bruising on the inner part of both ears, as well as lacerations and hemorrhaging inside his mouth, which was consistent with a blunt impact to the mouth.

Defendant testified as well. He described J.M. as a typically clumsy toddler who fell frequently. He explained that on the night of J.M.'s injury, he had gotten into a fight with his live-in girlfriend (who was not J.M.'s mother), about some texts from another woman on his phone. The fight culminated in the girlfriend packing her things and leaving for a motel. Defendant acknowledged he was "sort of" upset about the fight with his girlfriend, and the fact she had left him, but claimed he was not mad, hurt or bothered "at all" by it. He claimed he was "[c]alm and collected."

4

According to defendant, after his girlfriend left, he gave J.M. a snack of grapes, and sat on the couch to do homework. A little while later, J.M. told defendant he needed to urinate, and defendant helped J.M. get his legs out of his "Onesie," took off his diaper, and told J.M. to take the diaper to the trash before going upstairs to use the bathroom. In cross-examination, defendant initially stated he did not recall if J.M.'s diaper was soiled, but ultimately acknowledged it was possible he had told Johnson that the diaper was soiled with diarrhea.

When it sounded like J.M. was finished on the toilet, defendant told him to come downstairs. The next thing defendant heard was J.M.'s cry, and he turned to find J.M. on the wooden floor at the bottom of the carpeted stairs. Defendant did not hear J.M. fall down the stairs. He saw that J.M.'s mouth was bloody and he appeared to be gagging. Defendant attempted to ensure J.M.'s airway was clear, and when J.M. appeared to be losing consciousness, he became fearful J.M. might not wake up again. Hence, in an effort to keep J.M. conscious, defendant slapped his face and called his name. He described it as "an intense moment," and acknowledged he might have told Johnson that he hit J.M. "pretty hard." Defendant believed he could get J.M. to a hospital faster by driving him than by calling an ambulance, and did so. During the drive, defendant slapped the left side of J.M.'s face repeatedly in an effort to keep him awake.

Defendant denied intentionally injuring J.M., or ever hitting him for discipline beyond a "little nudge" on his butt "[t]o get his attention," and he maintained J.M.'s injuries were caused when he accidentally fell down the stairs.

DISCUSSION

1. *Admission of Evidence Pertaining to Prior Incidents of Abuse Against C.C.*

Defendant first argues the court erred by admitting evidence about the prior incidents involving his treatment of C.C. We "appl[y] the abuse of

5

discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 717.)

Starting with the first incident, in which C.C. volunteered to his preschool teacher that defendant, whom he called "[D]addy," would "whoop my ass" because "I poopy," the preschool teacher testified about what C.C. said, and also about defendant's response when told of C.C.'s prediction "that's because he knows he's in trouble," which appeared to confirm it.

Defendant asserts that evidence pertaining to this incident was inadmissible in its entirety, as it did not demonstrate a prior incident of "child abuse," which he acknowledges would have been admissible under Evidence Code section 1109. We disagree. Defendant himself points out that "whooping an ass is a colloquial phrase that may or may not involve child abuse," thus conceding that child abuse is a reasonable inference to draw. Indeed, it would be difficult to imagine what sort of "ass whooping" inflicted on a three-year-old child who had a potty training accident would not qualify as "inflict[ing] unjustifiable physical pain or mental suffering." (§ 273a, subd. (b).) Moreover, the fact that C.C.'s statement, on its face, predicts a *future* event does not preclude the inference that his prediction is based on past experience. And finally, the fact defendant himself seemed to reinforce C.C.'s prediction when told of it, rather than expressing any surprise or dismay, also reinforces the inference of abuse. We find no abuse of discretion in the court's decision to admit the evidence of this incident.

And having concluded that the evidence of the potty training incident supported a reasonable inference that defendant engaged in child abuse against C.C. in response to his earlier potty training accidents, we also reject defendant's contention that allowing the jury to hear this evidence and potentially infer that very conclusion based on it, violated his federal due process rights.

Defendant also challenges, on hearsay grounds, the trial court's decision to allow C.C.'s preschool teacher to testify about what C.C. said to her, both in connection

6

with the potty training incident and the incident in which defendant choked him. The prosecution argued these statements were admissible under both Evidence Code sections 1240 (spontaneous declarations) and 1360 (statements made by children under 12 in child abuse proceedings.) The trial court indicated it believed C.C.'s statements about the choking incident met all the requirements of a spontaneous declaration because it appeared to be a spontaneous statement borne of a startling occurrence, and was made before there was time to contrive or misrepresent. The trial court expressed the same view about C.C.'s statement that defendant would "whoop [his] ass" for soiling himself, noting that the precipitating "stressful event is the soiling of the diaper." After concluding both statements were admissible as spontaneous declarations, the trial court added, "And both statements are coming in under 1360. I believe that the elements under 1360 have been met."

We find no error in the trial court's decision to admit the statements as spontaneous declarations. Evidence Code section 1240 states, "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." And "'[t]o render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.'" (*People v. Poggi* (1988) 45 Cal.3d 306, 318 (*Poggi*).) This is largely a factual inquiry. (*Ibid.*)

Defendant contends that C.C.'s declaration that defendant would "whoop [his] ass" after he had the potty training accident did not meet the statutory definition of a

7

spontaneous declaration because C.C. was not under the stress of excitement caused by his perception of a beating when he made his declaration. Instead, defendant argues that as noted by the trial court, C.C. was under the stress of soiling his diaper. But the trial court certainly could have inferred that C.C.'s stress over soiling his diaper was caused by his perception that he would be "whooped" by defendant as a consequence of having done so. After all, most children undergoing potty training are not particularly stressed by having an accident. We consequently reject defendant's contention.

And defendant claims C.C.'s statement about the choking incident did not qualify for admission as a spontaneous declaration because it was insufficiently reliable. We disagree. The fact that C.C. kept his eyes downcast when telling his teacher what happened, in what defendant characterizes as an expression of shame, does not suggest any lack of spontaneity. Moreover, although C.C. did not repeat the choking claim when his teacher took him to speak with the other teacher – and instead related that "[D]addy whoop my ass with a shoe" – the other evidence, including the marks on C.C.'s neck and the petechia, pretty clearly indicated that C.C. had been choked. Moreover, defendant pleaded guilty to assault as a result of the incident. We certainly could not say the trial court abused its discretion in deciding to admit the statement as a spontaneous declaration.

*2. Restriction on Defense Counsel's Closing Argument*

Defendant also contends the court erred by improperly restricting his closing argument. Again, we cannot agree.

The first two incidents defendant complains of involved his counsel's attempt to undermine the testimony of the Sheriff's Investigator, Johnson, who described the inconsistencies in statements made by defendant during their interview. As defendant explains, his counsel attempted to do this in two ways. First, he pointed out that Quesada, the officer who first arrived at the hospital and spoke to defendant, was not

8

called to testify – and suggested this was suspicious: "Do you think if there was anything different about what [defendant] told Deputy Quesada that you wouldn't have been hearing from him[?]" The prosecutor objected to this question as speculative, and the objection was sustained. And second, defendant's counsel questioned the prosecutor's failure to play the audio and video tapes of defendant's interview with Johnson – again suggesting that there was something suspicious in the prosecutor's failure to present that evidence: "So if [defendant] was acting so weird, and said all these inconsistent things, why didn't you see that?"

Defendant argues it was improper to sustain the prosecutor's objections because his argument was "that if his stories had been as contradictory as the prosecution made out, the prosecution would have played the recording of his statements to Johnson and called Quesada, who he talked with first." Defendant asserts that "[c]omment on a party's failure to produce evidence it possesses or call logical available witnesses is always proper." But of course, the propriety of any argument is dependent upon the circumstances, and no comment is "always proper." Indeed, the very case defendant relies upon to support his contention states, "We recognize that a rule permitting comment on a defendant's failure to call witnesses is subject to criticism if applied when the reason for his failure to do so is ambiguous . . . . Therefore, the trial court must have discretion to determine when the circumstances of the case are such that comment is not permissible." (*People v. Ford* (1988) 45 Cal.3d 431, 447.)

Moreover, the record does not support defendant's assertion that Quesada was a "logical" witness to corroborate (or undermine) Johnson's description of the conflicting statements defendant made during their interview. To the contrary, there is nothing in the record to suggest Quesada was present for the interview, which took place at the station. And since neither side offered any evidence about what statements defendant made to Quesada during whatever conversation they might have had before Johnson arrived at the hospital, we concur with the view of the prosecutor (and the trial

9

court), that defense counsel's attempt to raise it during argument was an invitation for the jury to speculate.

Because section 1044 specifically obligates the court to "limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved," we discern no abuse of discretion in its decision to sustain the prosecutor's objection when defense counsel referred to the failure to call Deputy Quesada.

Similarly, the trial court did not err in sustaining an objection to defense counsel's reference to the prosecutor's failure to introduce the recordings of defendant's interview with Johnson. Whatever recordings existed were equally available to both sides, and both know *exactly* what evidence they contained. Thus, there is no inference to be drawn (as there might be in the case of a witness's anticipated testimony) that the prosecutor's failure to introduce it reflects some inside knowledge about the weakness of that evidence. Presumably, if the available recording undermined Johnson's testimony – as defense counsel was attempting to suggest in his argument – then defendant *would have introduced it*. But defense counsel cannot use argument to suggest the jury draw factual inferences adverse to the prosecution based on evidence defendant himself could have introduced, but chose not to.

Finally, defendant argues the trial court improperly sustained an objection to his characterization of the prosecutor's "theory that [appellant] was so upset about [his girlfriend] going to stay at the motel that night, or the poop in J.M.'s pants, that he just flew off the handle and beat him," as "speculation." We disagree. The prosecution's argument that the timing of J.M.'s injuries suggested a connection between them and the fight defendant had with his girlfriend – raising the inference that defendant may have injured J.M. out of anger and frustration – was not "speculation." Instead, it was a

10

reasonable inference to draw from the evidence. Consequently, the court did not err in sustaining an objection to that characterization.

*3. The Administrative Fee*

Defendant's last assertion is that the court erred by imposing the 15 percent administrative fee specified in section 1203.1, subdivision *(l)*. That subdivision states, in pertinent part: "If the court orders restitution to be made to the victim, the entity collecting the restitution may add a fee to cover the actual administrative cost of collection, but not to exceed 15 percent of the total amount ordered to be paid." (§ 1203.1, subd. *(l)*.)

Although nothing in the language of the subdivision specifies it is limited to cases where probation is ordered, defendant contends the administrative fee applies only to probationers, and the Attorney General concedes the point. But we cannot accept the Attorney General's concession.

In support of his assertion that the administrative fee applies only to probationers, defendant simply cites to *People v. Robertson* (2009) 174 Cal.App.4th 206, 210-211 (*Robertson*), and *People v. Eddards* (2008) 162 Cal.App.4th 712, 716 (*Eddards*), and offers no analysis. The Attorney General cites the same two cases in support of its concession, again without analysis. However, neither case actually supports the assertion.

In *Eddards*, the court reversed an administrative fee under section 1203.1, subdivision *(l)*, because the restitution fine in question had not been awarded "to the victim" as specified in the subdivision. Thus, the holding in *Eddards* was that the administrative fee specified in section 1203.1, subdivision *(l),* was inapplicable to restitution fines other than those awarded to victims. And because the defendant in *Eddards* actually *was a probationer*, no party had occasion to address the issue of

11

whether the administrative fee would also be applicable to nonprobationers. Consequently, *Eddards* does not support defendant's assertion.

In *Robertson*, the same court that decided *Eddards* considered an administrative fee imposed on a restitution fine under a *different* Penal Code section – section 1202.4, subdivision *(l)*. In doing so, the *Robertson* court characterized the *Eddards* opinion in a manner suggesting it *had* restricted the imposition of administrative fees under section 1203.1, subdivision *(l)*, in the manner defendant suggests: "In *Eddards*, the court held that a 10 percent administrative fee may be imposed under section 1203.1, subdivision *(l)*, *only when, as a condition of probation*, a defendant is ordered to pay restitution to the *victim*." (*Robertson, supra*, 174 Cal.App.4th at p. 210, italics added.) But as we have explained, *Eddards* actually had no occasion to consider such a restriction, and did not impose it.

And as for *Robertson*, it did not even consider section 1203.1, subdivision *(l)*. Instead, the *Robertson* court pointedly chided the parties – both the defendant and the Attorney General – for not recognizing that they were dealing with a different administrative fee statute in that case: "Section 1202.4 is a different statute with a different plain and unambiguous meaning." (*Robertson, supra*, 174 Cal.App.4th at p. 211.) And because the language of that different statute *did not* limit its administrative fee to cases where restitution had been ordered "to the victim," nothing in *Eddards* had precluded the trial court's imposition of the administrative fee in that case.

Thus, like *Eddards*, *Robertson* offers no support for the contention that the administrative fee imposed under section 1203.1, subdivision *(l)*, would apply only to probationers. In fact, we note that if *Robertson* had been considering section 1203.1, subdivision *(l)*, it would severely undermine defendant's argument because the defendant in *Robertson* – whose administrative fine was upheld – was also *not a probationer*.

12

Because defendant has failed to support his contention that the administrative fee imposed pursuant to section 1203.1, subdivision *(l)*, applies only to probationers, we reject it.

DISPOSITION

The judgment is affirmed.


RYLAARSDAM, ACTING P. J.

WE CONCUR:


BEDSWORTH, J.


MOORE, J.

13